**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                    No.  CR-05-2270 MV
                                                No.  CR-05-2271 MV

CESARIO JUAREZ-TORRES and
TERESA BETANCOURT-PEREZ

        Defendant.

**MEMORANDUM OPINION AND ORDER**

      **THIS MATTER** comes before the Court on Defendants' Motion to Suppress **[Doc. No. 19]**,

filed November 9, 2005 and the United States' Motion for Fingerprint Exemplars **[Doc. No. 24]**, filed

January 4, 2006.[1]  The Court, having considered the motion, briefs, relevant law and being otherwise

fully informed, finds that the Defendants' motion is well taken and will be **GRANTED**, and that the

United States' motion is not well taken and will be **DENIED**.

**BACKGROUND**

      On June 28, 2005, Defendants Cesario Juarez-Torres ("Defendant Juarez") and  Teresa

Betancourt-Perez ("Defendant Betancourt") were pulled over by border patrol agents, approximately

12 miles west of Albuquerque, New Mexico on I-40, near mile marker 145.  Senior Patrol Agent

Oscar Duenez, along with some other border patrol agents, had set up a "static observation post" at

this location to look for passing vehicles that might be transporting illegal aliens.  The "static

observation post" was approximately 250 miles from the border.  The government states that the

---

[1]The Motion to Suppress was originally filed by Defendant Teresa Betancourt-Perez.  On November 16, 2005, Defendant Cesario Juarez-Torres filed a Motion to Join Defendant's Motion to Suppress **[Doc. No. 20]**, which was granted by this Court on December 8, 2005 **[Doc. No. 23]**.

observation post was set up at that location because Department of Homeland Security Intelligence indicates that I-40 is a known alien smuggling corridor.

According to border patrol agents, they had reasonable suspicion that the vehicle may have been engaged in alien smuggling.  Specifically, the agents assert that the following factors supported their suspicion: characteristics of the area of the stop, previous experience of the agent with alien traffic, driver's and passengers' response to the border patrol observation post, aspects of the vehicle, appearance of vehicle as heavily loaded, cargo inconsistency, ethnicity of occupants and general occupant relationships.

Once the Defendants were pulled over by the border patrol agents, they admitted that they were Mexican nationals in the United States illegally and they were arrested.

On October 12, 2005, a one count indictment was filed against Defendant Betancourt, charging her with illegal reentry into the United States subsequent to a conviction for an aggravated felony, in violation of 8 U.S.C. §§ 1326(a)(1) and (a)(2) and 8 U.S.C. § 1326(b)(2).  Also, a one count indictment was filed against Defendant Juarez, charging him with illegal reentry into the United States subsequent to a conviction for a felony, in violation of 8 U.S.C. §§ 1326(a)(1) and (a)(2) and 8 U.S.C. § 1326(b)(1).

## DISCUSSION

The issue now before this Court is what evidence, if any, may the government rely on at trial to establish Defendants' identity and the fact of their illegal presence in the United States.  Defendants argue that all evidence of their identity, including fingerprints, statements, purported immigration file, and all observation of their presence in the United States, obtained as a result of their stop by border patrol agents on June 29, 2005, should be suppressed.  The government argues that such evidence

should not be suppressed and also moves this Court to compel Defendants to submit fingerprint exemplars for the purpose of substantiating Defendants' identity.

## I.  Defendants' Motion to Suppress

At international borders and their functional equivalents, the protections of the Fourth Amendment are not applicable.  *United States v. Venzor-Castillo*, 991 F.2d 634, 636-37 (10th Cir. 1993) (citing *Carroll v. United States*, 267 U.S. 132, 153-54 (1925)); *see also, Almeida-Sanchez v. United States*, 413 U.S. 266, 272 (1973) (holding that stop by a roving patrol twenty miles away from border was not "functional equivalent" and was, therefore, subject to Fourth Amendment).   In fact, "Border searches from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had entered into our country from outside.  There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause." *Venzor-Castillo,* 991 F.2d  at 637 (quoting *United States v. Ramsey*, 431 U.S. 606, 619 (1977)).

However, beyond the border and its functional equivalent, the fundamental protections of the Fourth Amendment are implicated and law enforcement may make an investigatory stop only if an officer has reasonable suspicion that "criminal activity may be afoot." *United States v. Quintana-Garcia,* 343 F.3d 1266, 1270 (10th Cir. 2003); *United States v. Monsisvais,* 907 F.2d 987, 989-90 (10th Cir. 1990); *see also, Brignoni-Ponce*, 422 U.S. 873, 884 (1975).  If the stop becomes more than a mere investigatory stop or a search ensues, there must be probable cause.  *United States v. Watson*, 423 U.S. 411, 417- 24 (1976).  While the border patrol is subject to regulations that set a 100 air mile limit, a stop made more than 100 air miles from the border is not a violation of a person's

Fourth Amendment rights, so long as the reasonable suspicion requirement is met. *United States v. Leyba*, 627 F.2d 1059, 1065 (10th Cir. 1980) (dictum).

An officer's "reasonable suspicion" must be based on the totality of circumstances. *Brignoni-Ponce*, 422 U.S. at 885 n.10. Although the Court may not make one factor determinative in a "totality of circumstances" analysis, the Court may assign different weights to individual factors. *See United States v. Little*, 60 F.3d 708, 712 (10th Cir. 1995); *Venzor-Castillo*, 991 F.2d at 638-39. The greater the distance from the border, the more distance from the border may weigh against a finding of "reasonable suspicion" when the Court engages in a "totality of circumstances" analysis. *See, e.g.*, *id*. This was the case in *Venzor-Castillo*, where the court assigned greater weight to the distance from the border because the distance was so great. Specifically, the *Venzor-Castillo* court stated that "the more attenuated the international border becomes, the greater the significance distance assumes in the equation used to measure the power to stop only on reasonable suspicion when the officer has no knowledge whatever about the point of origin of a particular traveler's route." *Id.* at 639.

The government argues that the methodology used in *Venzor-Castillo* has been soundly rejected by the Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002). The government summarizes its objection to *Venzor-Castillo* by stating that "not only did the court fail to apply the totality of circumstances in that case or assess other factors, but it also failed to recognize the real hypothesis for an investigatory stop is the reasonable suspicion to believe that criminal activity may be afoot." Govt's Resp. 27-28. The government asserts that "It must be concluded that *Venzor-Castillo* is no longer useful precedent for this circuit." *Id*. at 28. In fact, this Court must conclude no such thing. *Venzor- Castillo* is still good law in this circuit and, contrary to the government's assertion, it is consistent with the Supreme Court's *Arvizu* instruction that "When discussing how

-4-

reviewing courts should make reasonable-suspicion determinations, we have said repeatedly that they must look at the 'totality of the circumstances' of each case . . . ." *Arvizu*, 534 U.S. at 273.

The *Venzor-Castillo* opinion indicates that the court did look at the totality of circumstances. While the court did give greater significance to the distance from the border in its analysis, it made clear that "if the officer has an articulable basis for believing that [the point of origin of a traveler's route] was across an international point, distance will have far less significance in judging the reasonableness of the officer's decision." *Venzor-Castillo*, 991 F.2d at 639. This statement by the court indicates that the court did not consider distance to be a determinative factor and that the court agreed that other factors may form a basis for reasonable suspicion in some cases even if the stop is a significant distance from the border.

Moreover, the finding in *Venzor-Castillo* is completely consistent with the finding in *Arvizu* that, in a totality of circumstances analysis, "some factors are more probative than others." *Arvizu*, 534 U.S. at 277. It makes absolute sense that when the basis for a stop by law enforcement is suspicion that the crime of illegal entry has occurred, the distance from the border is a more probative factor. I conclude that this Court is guided by the principal that the basis for an officer's reasonable suspicion must be based on the totality of the circumstances and *Venzor-Castillo* is instructive precedent on this point.

*Venzor-Castillo* is factually similar to the case at hand. In *Venzor-Castillo*, three border patrol agents were conducting a patrol approximately 235 miles from the border. The three border patrol agents were standing next to a marked border patrol car along the edge of Highway 36. The most direct route from the border to the area of the highway being patrolled required passage through thirteen towns or cities. Additionally, the relevant section of the highway was a segment of a highway

route extending from the Mexican border to I-40, an east-west interstate highway, and the route crossed five different highways.

The main border patrol agent, Agent Smith, had over ten years experience and had been assigned to patrol the area in question because of an increase of alien smuggling in the area, which amounted to nine cases involving thirty undocumented aliens during the previous month. The Court, in *Venzor-Castillo*, set forth the following case facts:

> Agent Smith and two other agents were standing next to a marked Border Patrol vehicle along the edge of Highway 36 . . . . When [Agent Smith] first spotted the car, he observed four or five occupants seated upright. As the car approached Agent Smith, however, he saw the passengers in the back seat slide down. Agent Smith also noted the car appeared to be heavily loaded with its undercarriage close to the road surface causing the tail pipe to drag on the road when the car hit bumps. He stated the vehicle was a large, older model Cadillac, which he often found to be favored by alien smugglers. Agent Smith thought it noteworthy that the three occupants in the front seat stared straight ahead as they passed him instead of looking toward him and his companions or the marked patrol car as most travelers do under similar circumstances.
>
> Agent Smith and his partner followed the defendant's car for a few miles, observing, in the meantime, the car had a temporary license in the rear window instead of a license plate.

*Venzor-Castillo,* 991 F.2d at 636.

The *Venzor-Castillo* court held that under the circumstances of the case, the standard of reasonable suspicion had not been met to show that criminal activity was afoot, namely, the crime of illegal entry into the United States. The court addressed a variety of factors in reaching this conclusion, but gave particular weight to the distance of the stop from the border and the fact that the defendant "could have entered the highway from any one of the thirteen towns and cities between the closest entry on the border and the point of the stop." *Id.* at 639-40.

-6-

Likewise, in the present case, border patrol agents had set up a "static observation post" approximately 250 miles from the border.  Also, there are at least as many towns and cities on the route from the border to the stop in this case, as the 13 towns and cities that were en route in *Venzor-Castillo*.  Unlike the highway at issue in *Venzor-Castillo*, which led to the border, in this case the highway does not even lead directly to or from the border; however, in both cases, the government contended that the highways were known smuggling corridors.

Also similar to *Venzor-Castillo*, the agents in this case noted that the car appeared to be heavily loaded and it was a vehicle known to be favored by alien smugglers (in this case it was a family mini-van, in *Venzor-Castillo* it was an older model Cadillac).  Another similarity between the cases is that the agents observing the vehicles carrying the defendants, found that it was significant that the occupants did not look toward the border patrol agents or the marked patrol car.  Also, in both cases, the border patrol agents had substantial experience - in *Venzor-Castillo*, the primary border patrol agent had over ten years experience; in this case, Special Agent Duenez has approximately eighteen years experience.

However, although there are similarities between *Venzor-Castillo* and the present case, there are also important differences that further weaken the government's assertion that there was reasonable suspicion to stop the Defendants.  For instance, in *Venzor-Castillo*, the border patrol agent believed he spotted people trying to hide in the back seat, whereas, in this case, the agent did not observe passengers trying to hide.  What the border patrol agent at first claimed to see in this case was "what appeared to be blankets covering the entire rear area of the van up to the bottom of the window." Govt's Resp. 14.  At the suppression hearing, Agent Duenez admitted that, while he could not see what was under the blankets, he assumed that there were people hiding underneath them.

Suppression Hr'g Tr. 82, June 29, 2006.  Agent Duenez testified that the presence of these blankets was an important factor in his investigation.  *Id*.

Oddly, however, the blankets are not mentioned in the initial post-arrest report prepared by border patrol.  It was not until an addendum was prepared that these blankets were mentioned and, in this context, one is led to believe the blankets are used to hide people underneath them.  Then, on cross-examination, additional information about the blankets was discovered that had not been previously disclosed by the government.  Namely, it was revealed that there were four blankets in the mini-van that were plastic-wrapped into neat cubes measuring two-feet by two-feet.  While Agent Duenez testified that at the time that he was deciding whether to stop the vehicle he could not see that the blankets were wrapped in plastic, he did admit that he could tell that they were folded into neat squares.  The impression initially created by the image of a blanket strewn across the back of the vehicle is very different from the impression created by the image of four neatly wrapped cubes of blankets placed in the back of the vehicle.  It is difficult to imagine how the agent could have suspected that aliens could be hiding under blankets folded in their plastic wrappers.  In fact, when Agent Duenez was questioned about how an individual could hide under such a cube-shaped blanket, he answered: "These guys are amazing."  Suppression Hr'g Tr. 106.

Another difference between the present case and *Venzor-Castillo* is that, in *Venzor-Castillo*, there had been reports of an increase in alien smuggling in the area in question; in the present case, there were no reports of unusual alien activity in the area in question.  This factor further weakens the government's claim that there was reasonable suspicion to stop the Defendants in this case. However, in this case, the government states that the defendants "were found going in the direction of travel, at the time of day, and in the peak season of the year in which alien smugglers travel east."

The government concedes, however, that these factors also implicate "thousands of legitimate travelers."  Govt's Resp. 31.

Another factor noted by the government in this case was cargo inconsistency, that is that the mini-van appeared to be heavily loaded in relation to the number of occupants and cargo load in the vehicle.  In *Venzor-Castillo*, border patrol agents also noted that the vehicle in question appeared to be heavily loaded.  In fact, in *Venzor-Castillo*, the border patrol agents observed the tail pipe of the vehicle dragging on the road when bumps were hit.  In the present case, the border patrol agent simply stated that the mini-van appeared heavily loaded and gave no evidence to support this assertion.  What the government did present was conflicting hypotheses as to why the mini-van may have appeared heavily loaded.  In their response to the motion to suppress, the government indicated that the presence of the blanket bundles in the cargo area accounted for the mini-van appearing to be overloaded.  The weight of the blankets, however, was minimal.  Then, at the suppression hearing, Agent Duenez testified that there were two large wooden tables in the back of the mini-van that accounted for the mini-van appearing to be heavily loaded.  This testimony marked the first time that any reference had been made to tables being present in the back of the mini-van.  The tables were not mentioned in the initial post-arrest report, in the addendum to that report, or in the government's response to Defendants' suppression motion.  This conflicting testimony leads this Court to question the credibility of the assertion that the vehicle appeared heavily weighted at the time the decision was made to stop it.

The government also contends that the presence of three adults in the mini-van did not comport with the "archetypical" family unit but, rather, is consistent with alien smuggling and it was notable that the vehicle's occupants did not appear to be interacting with one another.  However,

given that it was 5:40 a.m. and the sun had not risen yet,  it would be natural for travelers to be sleepy and not interacting very much.

Another difference between the present case and this case is that in *Venzor-Castillo* the border patrol agents observed that the car had a temporary licence plate, instead of a regular license plate. There is no evidence that the license plate in this case was temporary.  However, the agents in this case found it significant that the mini-van had a license plate from Tennessee, an east coast state. However, the presence of an east coast license plate would implicate many travelers driving on this country's highway systems.

Finally, the government asserts that a primary basis for the stop was safety concerns, particularly the fact that illegal immigrants being transported in this fashion sometimes do not wear seat belts.  But  Agent Duenez testified that he did not observe that any of the occupants of the mini-van were not buckled in and stated that the potential non-use of seatbelts was not a factor in his decision to pull the mini-van over.  In fact, Agent Duenez did not articulate any safety concern that played a role in his decision to stop the mini-van.  At most, he made a general reference to the safety concerns of "over-stuffing" vehicles.  Suppression Hr'g Tr. 106.  The Tenth Circuit has stated, "A traffic stop . . . does not violate the Fourth Amendment if it 'is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  *United States v. Laughrin*, 438 F.3d 1245, 1247 (10th Cir. 2006) (quoting *United States v. Callarman*, 273 F.3d 1284, 1286 (10th Cir. 2001)).  However, a generalized concern that there may be people that are not properly secured in a vehicle, or are otherwise traveling unsafely, does not satisfy the requirement of a reasonable articulable suspicion. *See, e.g., Laughrin*, 438 F.3d at 1247.

-10-

This Court is also struck by the fact that, as a matter of border patrol policy, the further from the border a border patrol stop occurs, the less effort that border patrol agents make to determine whether the vehicle originated from the border.  As Agent Duenez testified, if this stop had happened on the border, the license plate number would have been called in to dispatch to obtain the border crossing history for the vehicle.  However, where border patrol stops occur over 100 air miles from the border, border patrol agents assume that the case will be handled administratively and not prosecuted and, therefore, border patrol does not bother to obtain the border crossing history for that vehicle.  Specifically, Agent Duenez testified that when border patrol stops are made beyond the 100 mile limit "rarely do we prosecute the drivers only because the distance of the border applies to this. And our AUSA will say, 'no, you can't prosecute this.'"  Suppression Hr'g Tr. 107.  Clearly, the government understands that border patrol stops beyond the 100 mile limit are less likely to withstand judicial scrutiny.   In order to avoid this scrutiny, the government's policy is to forgo criminal prosecution in these cases and to pursue them in an administrative proceeding, where details such as a vehicle's border crossing history are presumably less likely to be questioned.

Examining the totality of circumstances present in this case, I find that there was not a sufficient factual basis for the agents to have reasonably suspected that criminal activity was afoot. The stop occurred approximately 250 miles from the border on a highway that did not originate at the border and that crossed numerous towns and cities.  Although the government asserts that the highway in question was known to be favored by alien smugglers, there were no reports of unusual alien activity in the area in question.  Moreover, there was no evidence that the mini-van in question even originated at the border and the border patrol agents chose not to verify the border crossing

history of that vehicle because they assumed this case would be handled "administratively" and not be prosecuted in court where, presumably, this practice would be challenged.

The Court also finds that the physical characteristics of the mini-van and its occupants do not support a finding of reasonable suspicion. Although border patrol agents claimed that the mini-van appeared to be heavily loaded, this claim is called into question by the fact that the government has set forth inconsistent reasons as to why the mini-van may have appeared heavily loaded. The agents did not observe anyone trying to hide inside the vehicle; they only observed the presence of four folded blankets wrapped in plastic that would have required someone "amazing" to hide under and, certainly, such blankets would not weigh enough to lower a vehicle enough to cause it to appear heavily loaded.

While Agent Duenez found that it was significant that the occupants did not look toward the border patrol agents or the marked patrol car, the testimony at the suppression hearing showed that he could have easily missed their glance, especially when Agent Duenez was focused on driving his patrol car at the same time that he was looking for a response from the occupants. In addition, it was approximately 5:40 a.m., and sunrise had not occurred yet when the mini-van was observed by the border patrol agents. The vehicle was traveling a little slower than 75 miles per hour. The lack of daylight and the speed that the vehicle was traveling both bolster the possibility that border patrol agents cold have missed a glance from the mini-van's occupants.

Additionally, while the border patrol agent contends that it was notable that the vehicle's occupants did not appear to be interacting with one another and that the presence of three adults in the mini-van did not comport with the "archetypical" family unit, this factor could implicate a large number of travelers that are lawfully within the United States. In addition, at 5:40 a.m., before

sunrise, the occupants of the mini-van could very well have been sleeping. Finally, Agent Duenez failed to articulate any safety concern that played a role in his decision to stop the mini-van in question.

Under the totality of these circumstances, the stop of the vehicle containing defendants was not constitutional. The Tenth Circuit opinion of *Venzor-Castillo* supports this conclusion, given the nearly identical facts between the two cases.

Defendant also argues that, in addition to being a violation of the Fourth Amendment, the stop violated 8 U.S.C. § 1357(a)(3), which provides:

> Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant--within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States.

8 U.S.C. § 1357(a)(3).

The term "reasonable distance" as used in 8 U.S.C. § 1357(a)(3), is defined, by regulation, as "within 100 air miles from any external boundary of the United States." 8 C.F.R. § 287.1(a)(2). However, in *Almeida-Sanchez*, the United States Supreme Court further limited the area that border patrol could make a stop without a warrant to the "functional equivalent" of the border. *Almeida-Sanchez*, 413 U.S. at 272. While the Court did not define "functional equivalent" it did hold in *Almeida-Sanchez* that a point twenty miles from the border did not constitute the "functional equivalent" of the border. Likewise, in this case, a point over 200 miles from the border is not the functional equivalent of the border and a warrantless stop was not justified. Therefore, in the absence of a warrant, the border patrol agent needed reasonable suspicion that criminal activity was afoot to

-13-

justify the initial stop of the vehicle.  As discussed *supra*, the border patrol agents did not meet this threshold; as a result, the Defendants' constitutional rights were violated.

Having concluded that the Defendants' constitutional rights were violated by the border patrol stop that led to their arrest, the issue remains, what remedy can the Court fashion to ameliorate the harm suffered as a result of Defendants' rights being violated and to deter future violations of a similar nature.

Defendants seek suppression of all evidence obtained as a result of the unlawful arrest, including evidence of identity, fingerprints, statements, purported immigration file and all observations of their presence in the United States.  The government readily admits in their response that, if the stop was illegal, then fingerprints and admissions following the arrest are suppressible.  However, it contends that identity and alien files are not suppressible.

Over twenty years ago, the Supreme Court, in the context of a civil proceeding, stated that "The 'body' or identity of a defendant or respondent in a criminal proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred." *I.N.S. v. Lopez-Mendoza*, 468 U.S. 1032, 1039 (1984).  The meaning and scope of this statement is a matter of dispute among the circuit courts.

In *Lopez-Mendoza*, the Supreme Court reviewed two civil cases, both involving deportation proceedings that took place following unlawful arrests.  One defendant, Adan Lopez-Mendoza, challenged an immigration court's jurisdiction over his person following his unlawful arrest, but did not object to the admission of evidence offered against him in the proceeding.  The other defendant, Elias Sandoval-Sanchez, objected to evidence being offered at the proceeding, rather than objecting to the jurisdiction of the court.  The Supreme Court disposed of Lopez-Mendoza's jurisdiction claim

-14-

by stating that "The 'body' or identity of a defendant or respondent in a criminal proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred." *Id*. Based on this premise, the Supreme Court held that the immigration court properly had jurisdiction, despite the underlying unlawful arrest.

However, the Supreme Court set forth a different tack to address Sandoval-Sanchez's claim. It began by stating that "The general rule in a criminal proceeding is that statements and other evidence obtained as a result of an unlawful, warrantless arrest are suppressible if the link between the evidence and the unlawful conduct is not too attenuated." *Id*. at 1040-41 (citing *Wong Sun v. United States*, 371 U.S. 471 (1963)). The Supreme Court went on to say that "The reach of the exclusionary rule beyond the context of a criminal prosecution, however, is less clear." *Lopez-Mendoza*, 468 U.S. at 1041. The Supreme Court then engaged in a lengthy cost-benefit analysis to determine the extent to which the exclusionary rule should apply in a civil deportation proceeding and concluded that evidence derived from an unlawful arrest need not be suppressed in a civil immigration proceeding.

Throughout its opinion in *Lopez-Mendoza*, the Supreme Court drew distinctions between civil proceedings and criminal proceedings. For instance, the Court, in its analysis, stated that "The reach of the exclusionary rule beyond the context of a criminal prosecution, however, is less clear." *Id*. Moreover, in its conclusion, the Court stated that "we conclude that application of the [exclusionary] rule in INS **civil** deportation proceedings . . . 'is unlikely to provide significant, much less substantial, additional deterrence.'" *Id*. at 1046 (quoting *United States v. Janis*, 428 U.S. 433, 458 (1976)) (emphasis added). In fact, the Supreme Court indicated that it expected the exclusionary rule to remain in full force as it pertained to criminal immigration proceedings, when it stated that "the

-15-

prospect of losing evidence that might otherwise be used in a criminal prosecution undoubtedly supplies some residual deterrent to unlawful conduct by INS officials." *Lopez-Mendoza*, 468 U.S. at 1042.

While the Supreme Court clarified the application of the exclusionary rule in the context of a civil proceeding, what the Supreme Court did not do in *Lopez-Mendoza* was set forth a new standard for exclusion of evidence obtained from an illegal arrest in a criminal proceeding. The standard was, and remains, that evidence obtained following an illegal arrest must be suppressed as "fruits" of the arrest unless it results from "an intervening independent act of a free will," and is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. at 486. In other words, the fruit of any illegal arrest is suppressible, not just the fruit of an arrest involving an "egregious violation" of one's rights.

The Third and Sixth Circuits read the *Lopez-Mendoza* opinion as if it did establish a new standard for suppression of evidence in a criminal proceeding. Both circuits have held that information regarding a defendant's true identity and his prior deportation is admissible, even if the underlying arrest was illegal, unless there has been an "egregious violation[] of Fourth Amendment or other liberties that might transgress notions of fundamental fairness and undermine the probative value of the evidence obtained." *United States v. Bowley*, 435 F.3d 426, 430 (3rd Cir. 2006); *see also*, *United States v. Navarro-Diaz*, 420 F.3d 581, 587 (6th Cir. 2005).

While the Third and Sixth circuits do accurately quote *Lopez-Mendoza* , they do so out of context. The statement in *Lopez-Mendoza* regarding an "egregious violation" was specifically tied to the Supreme Court's later statement that "At issue here is the exclusion of credible evidence gathered in connection with peaceful arrests by INS officers. We hold that evidence derived from

such arrests need not be suppressed in an INS **civil** deportation hearing." *Lopez-Mendoza*, 468 U.S. at 1051 (emphasis added). As previously indicated, the correct standard for exclusion of evidence in a criminal trial was, and remains, that evidence obtained following an illegal arrest must be suppressed as "fruits" of the arrest unless it results from "an intervening independent act of a free will," and is "sufficiently an act of free will to purge the primary taint of the unlawful invasion." *Wong Sun v. United States*, 371 U.S. at 486.

The Fifth and Ninth Circuits have also read *Lopez-Mendoza* to mean that a defendant's identity is not suppressible in criminal actions. *See United States v. Roque-Villanueva*, 175 F.3d 345, 346 (5th Cir. 1999); *United States v. Guzman-Bruno*, 27 F.3d 420, 421-22 (9th Cir. 1994). The premise for this conclusion in these two circuits seems to be a strict application of the Supreme Court's statement that "The 'body' or identity of a defendant or respondent in a criminal proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search or interrogation occurred." *Lopez-Mendoza*, 468 U.S. at 1039. These two circuits give no consideration to the fact that, in *Lopez-Mendoza*, this statement was made in the context of a jurisdiction claim in a civil proceeding.

For instance, in *Guzman-Bruno*, the Ninth Circuit denied defendant's appeal to suppress all evidence of his identity, which was obtained as a result of an illegal arrest. The Ninth Circuit summarily disposed of the issue by stating that "A defendant's identity need not be suppressed merely because it is discovered as the result of an illegal arrest or search. 'There is no sanction to be applied when an illegal arrest only leads to discovery of a man's identity.'" *Guzman-Bruno*, 27 F.3d at 421-22 (quoting *Hoonsilapa v. INS*, 575 F.2d 735, 738 (9th Cir. 1978), modified by, 586 F.2d 755 (9th Cir. 1978). The foundation that the Ninth Circuit provided for this assertion was the Supreme

-17-

Court's statement in *Lopez-Mendoza*.  The Ninth Circuit provided no analysis of *Lopez-Mendoza* and apparently gave no consideration to the context in which the statement was made in *Lopez-Mendoza*. Subsequent Ninth Circuit cases dealing with this issue have similarly disposed of the issue.  *See, e.g.*, *United States v. Ortiz-Hernandez*, 427 F.3d 567, 577 (9th Cir. 2005);[2] *United States v. Garcia-Beltran*, 443 F.3d 1126, 1131-32 (9th Cir. 2006).  In fact, the Ninth Circuit has taken this premise so far that it even has held that identity evidence obtained as a result of an **egregious** constitutional violation may not be suppressed.  *United States v. Del Toro Gudino*, 376 F.3d 997, 1001 (9th Cir. 2004).

Likewise, the Fifth Circuit has taken the Supreme Court's statement in *Lopez-Mendoza* and applied it in criminal proceedings.  In *United States v. Roque-Villanueva*, 175 F.3d 345 (5th Cir. 1999), the Fifth Circuit cited *Lopez-Mendoza* to support its holding in a criminal proceeding that an individual's identity is never suppressible.  *See id.* at 345 (court also cited *Guzman-Bruno*, 27 F.3d at 420).  In so holding, the Fifth Circuit gave no indication that it considered the civil context of *Lopez-Mendoza*.

On the other hand, the Eighth Circuit has held that identity evidence, such as fingerprints, taken from a defendant during an illegal arrest or stop, are subject to suppression.  *See United States v. Guevara-Martinez*, 262 F.3d 751, 755-56 (8th Cir. 2001).  Also, in dictum, the Eighth Circuit has

---

[2]In a separate opinion, dissenting from denial of an *en banc* rehearing of *Ortiz-Hernandez*, the dissent criticizes the court's misplaced reliance on *Lopez-Mendoza*, stating "One need look no further than Lopez-Mendoza itself to confirm that the 'body or identity' language is inapplicable where a defendant raises a Fourth Amendment *evidentiary* challenge.  The second respondent in *Lopez-Mendoza*, Sandoval-Sanchez, '**objected not to his compelled presence at a deportation proceeding, but to evidence offered at the proceeding**.'"  *United States v. Ortiz-Hernandez*, 441 F.3d 1061, 1063 (dissenting from denial of *en banc* reconsideration)(emphasis in original)(quoting *Lopez-Mendoza*, 468 U.S. at 1040.)

stated that where the identity of a defendant is discovered through an unlawful stop, the government must prove Defendant's identity in a subsequent criminal proceeding without relying on the tainted evidence. *United States v. Rodriguez-Arreola*, 270 F.3d 611, 619 (8th Cir. 2001).[3]

The Tenth Circuit, in published decisions, has not addressed the issue of suppression of illegally obtained identity evidence. *United States v. White*, 326 F.3d 1135, 1137 n.1 (10th Cir. 2003). However, the Tenth Circuit did address the issue in the unpublished decision of *United States v. Limon-Soto*, 115 Fed.Appx. 417 (10th Cir. Oct. 15, 2004). In *Limon-Soto*, the defendant appealed the admission of identity evidence obtained from an illegal stop. At trial "the parties conceded the Bureau of Immigration and Customs Enforcement learned of Mr. Limon-Soto's immigration status and criminal history only as a result of the identity information obtained from him after the illegal traffic stop . . . ." *Limon-Soto*, 115 Fed.Appx. at *422. The Tenth Circuit held that the identity evidence at issue was not suppressible. However, instead of holding that such evidence was never suppressible, the court examined whether the link between the identity evidence and the unlawful conduct "was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.* (citing *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000)). Applying the attenuation principle, the Tenth Circuit held that the "identity came by means sufficiently distinguishable to be purged of the primary taint." *Limon-Soto*, 115 Fed.Appx. at *422. Specifically, the Tenth Circuit found that nothing in the record showed that defendant gave the police his

---

[3]In their Response, the government contends that *Rodriguez-Arreola* held that "even if a defendant is unconstitutionally arrested and held, his identity cannot be suppressed." Govt.'s Resp. at 39. This is not what *Rodriguez-Arreola* held. Rather, it held that the prosecution could continue "so long as [the government] used **untainted** evidence of [defendant's] identity." *Rodriguez-Arreola*, 270 F.3d at 619 (emphasis added). In other words, the government was free to prove the defendant's identity so long as it could do so without relying on information obtained from the unlawful stop.

identification involuntarily and that "the record [was] void of any exploitation of the illegality of the stop or flagrancy of official misconduct in obtaining Mr. Limon-Soto's identity."  *Id.*

After reviewing the different interpretations of *Lopez-Mendoza*'s import among the circuits, I conclude that the holding in *Lopez-Mendoza* does not prohibit suppression of identity evidence in the context of a criminal proceeding.  Moreover, I conclude that the correct standard for exclusion of evidence in a criminal trial is that evidence obtained following an illegal arrest must be suppressed as "fruits" of the arrest unless it results from "an intervening independent act of a free will," and is "sufficiently an act of free will to purge the primary taint of the unlawful invasion."  *Wong Sun v. United States*, 371 U.S. at 486.

In *United States v. Olivares-Rangel*, 324 F.Supp.2d 1218, 1223-24 (D.N.M. 2004), Judge Brack reached the same conclusion and held  that identity evidence obtained *via* an illegal arrest by border patrol is suppressible.  In that case, a border patrol agent had stopped the defendant without reasonable suspicion in violation of the Fourth Amendment.  Following the stop, the agent recognized the defendant as an undocumented person he was familiar with, asked the defendant questions about his identity and citizenship, verified the defendant was in the country illegally, took the defendant's fingerprints at the station, used those prints to connect the defendant to his immigration and prior criminal record and used that information to elicit incriminating admissions from the defendant.  The court held that the illegal stop tainted all the evidence of the defendant's identity, including his name and fingerprints and the border patrol agents' knowledge of his presence in the United States and thus all that evidence had to be suppressed.  The court stated that "the identity evidence that was

unlawfully seized from Olivares-Rangel cannot be used to prove Olivares-Rangel's presence in the United States or to tie Olivares-Rangel to his criminal and immigration records.  *Id*. at 1224.[4]

After concluding that identity evidence may be suppressed in a criminal proceeding, the issue remains, should the identity evidence in this case be suppressed.  The standard for answering this issue is that evidence obtained as a result of an illegal arrest may not need to be suppressed if the primary taint of the violation has been purged.  *Wong Sun*, 371 U.S. at 488.  "When there has been such a violation, the government bears the heavy burden of showing that the primary taint of that violation was purged."  *United States v. Caro*, 248 F.3d 1240, 1247 (10th Cir. 2001).  "To satisfy this burden, 'the government must prove, from the totality of the circumstances, a sufficient attenuation or break in the causal connection between the illegal detention and the consent.'"  *Id.* (quoting *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996)).  When a court "examine[s] the totality of the circumstances, no single fact is dispositive, but the [following] factors . . . are especially important: (1) the temporal  proximity of the illegal detention and consent, (2) any intervening circumstances, and (3) the purpose and flagrancy of any official misconduct."  *Id.*

In the present case, Defendants' identity was not known by the border patrol until after the illegal detention was in progress.  During the stop, the border patrol questioned the Defendants about their immigration status and the Defendants admitted that they were from Mexico and in the United States illegally.  The Defendants' fingerprints were obtained shortly after the stop commenced, when the Defendants were taken by border patrol agents to the border patrol station.  The Defendants'

---

[4]Also, in an unpublished decision, Judge Black held that "evidence of the Defendant's identity obtained as a result of the illegal stop and arrest is suppressible evidence, including Defendant's statements regarding his identity and any fingerprints taken from the Defendant during the illegal stop and arrest."  *United States v. Gonzales-Calderon*, No. 05-CR-1369, at 6 (D.N.M. Sept. 16, 2005) (identity evidence obtained pursuant to an illegal traffic stop by border patrol).

fingerprints then led the officials to the corresponding immigration files ("A-files").  At some point, after the fingerprints were obtained, Defendant Betancourt-Perez admitted her identity to the police.

All of these actions occurred within hours of the initial stop and each action was the natural progression of the action before.  There was no "intervening circumstances" during the relevant time that may have attenuated the initial taint of the illegal stop.  The Defendants were detained throughout the entire time.  While the Defendants did admit to their illegal status and Defendant Betancourt-Perez admitted her identity, these admissions were tainted by the illegality of the stop. *See United States v. Millan-Diaz*, 975 F.2d 720 (10th Cir. 1992) (holding that statements made by a defendant to border patrol agents after they had stopped the defendant's car while on roving patrol are inadmissible in evidence as the fruit of the poisonous tree where the continued detention of the defendant was not justified and exceeded the limits of an investigative stop.)

Moreover, the official misconduct in this case was flagrant.  The border patrol is subject to regulations that set a 100 air mile limit for border stops.  Although, a stop beyond 100 air miles does not automatically amount to a violation of a person's Fourth Amendment rights, it is a limit set by regulation, which the border patrol has chosen to ignore.  *See* discussion *supra*.

Because all of the evidence obtained during the stop and subsequent detention at the border patrol station is tainted, the government should not be allowed to circumvent this taint by back door avenues.  However, the government contends that they should still be allowed to use the Defendants' A-files.[5]

---

[5]The government attempts to muddle the issue by raising proprietorship of the A-file.  I find no merit in the suggestion that ownership of the evidence at issue affects it being subject to the proscriptions that result from a violation of the Fourth Amendment.  There is no exception for illegally obtained evidence even assuming, *arguendo*, that is owned by the government.

The government would not have known to access Defendants' A-files but for the illegal stop. If this Court suppresses all evidence related to Defendants' identities, the government will have no evidence to tie the Defendants to their respective A-files.  If, as the government asserts, they should be allowed to access Defendants' A-files anyway, then, once a stop is conducted, illegally or not, an illegal alien will be subject to prosecution and courts will have no recourse against detentions that violate their rights.  This cannot stand.  "The exclusionary rule was fashioned as a sanction to redress and deter overreaching governmental conduct prohibited by the Fourth Amendment."  *Davis v. Mississippi*, 394 U.S. 721, 724 (1969).  As the Supreme Court has stated, "The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the Court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become sacred and inaccessible.  If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed."  *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392 (1920).

An alien present in the United States without permission, after having been previously deported, has committed a crime.  However, the cloak of Fourth Amendment protection does not discriminate between United States citizens and illegal aliens.  "For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens."  *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975).  If police are free to detain and question anyone they want in order to obtain the

person's identity, without fear of the exclusionary rule, they may be tempted, even in the absence of reasonable suspicion, to single out people of certain ethnic backgrounds for questioning.

## II.    United States' Motion for Fingerprint Exemplars

The government through a motion for fingerprint exemplars should not be allowed to accomplish the same thing that it is barred from accomplishing to begin with because of its illegal conduct.

The government argues that its request for fingerprint exemplars does not offend the Fourth Amendment and makes the broad assertion that "An individual does not enjoy a constitutionally protected privacy interest in his fingerprints."   Govt's Mot. for Fingerprint Exemplars 2.   The government's argument is not well taken.   In support of its assertion that the Fourth Amendment is not implicated, the government cites three Supreme Court cases, none of which support the government's argument.

First, in *Cupp v. Murphy*, 412 U.S. 291 (1973), the Court recognized that a defendant's fingerprints may come under the purview of Fourth Amendment protection, but found that the Fourth Amendment was not violated in that case because there was probable cause to believe that the respondent had committed murder.   The Court specifically stated that "The vice of the detention in *Davis* [where defendant was arrested without probable cause] is therefore absent in the case before us."   *Cupp*, 412 U.S. at 295 (referring to *Davis v. Mississippi*, 394 U.S. 721 (1969)).   Clearly, *Cupp* is distinguishable from the present case because of the presence of probable cause in *Cupp*.

The government also cites *United States v. Dionisio*, 410 U.S. 1 (1973).   In *Dionisio*, the Court held that the defendant could be compelled to provide voice exemplars before a grand jury (fingerprint evidence was raised by analogy).   In so holding, it stated that the compelled production

-24-

of the voice exemplars would not violate the Fifth Amendment.  *Id.* at 12.  However, the Court

recognized that Fourth Amendment might be implicated if the initial restraint of a defendant infringed

on his Fourth Amendment rights.  *Id.* at 8.

Finally, the government cites *Schmerber v. California*, 384 U.S. 757 (1966), to support its

argument.  In *Schmerber*, the issue was admissibility of blood taken over the defendant's objection

(fingerprint evidence was raised by analogy in this case).  In examining the admissibility of such

evidence the Court stated that "if compulsory administration of a blood test does not implicate the

Fifth Amendment, it plainly involves the broadly conceived reach of a search and seizure under the

Fourth Amendment."[6]  *Id.* at 767.

Contrary to the government's argument, each of the above referenced cases support the

assertion that fingerprint evidence may implicate Fourth Amendment protections and do not support

the government's assertion that "An individual does not enjoy a constitutionally protected privacy

interest in his fingerprints."

Defendants have been detained since the time of the arrest, which occurred over a year ago.

The government now seeks to exploit this detention that resulted from their unlawful arrest by

gathering evidence that it otherwise would not have obtained.  However, if the government is allowed

through fingerprint exemplars to accomplish what it is precluded from doing because of its violations

of Defendants' constitutional rights, the force of the exclusionary rule will effectively be gutted.[7]

---

[6]The government also cites one Tenth Circuit case, *Snow v. Oklahoma*, 489 F2d 278 (10th Cir. 1973), in support of their Fourth Amendment argument.  However, *Snow* is inapposite because it was addressing a **Fifth** Amendment argument when it stated that "there is no constitutional right not to be fingerprinted."  *Id.* at 279-280.

[7]The government also argues that requiring fingerprint exemplars would not violate the Defendants' Fifth and Sixth Amendment rights.  However, since the argument under the Fourth

## CONCLUSION

When the border patrol agents stopped the vehicle that Defendants were traveling in, the agents lacked reasonable suspicion that criminal activity was afoot. Therefore, the stop and seizure violated Defendants' constitutional rights. To remedy this violation, I find that it is proper to suppress all evidence obtained as a result of this unlawful stop, including evidence of identity, fingerprints, statements, purported immigration file and all observations of the Defendants' presence in the United States. Moreover, I find that the government may not benefit from the illegality of the stop by now obtaining fingerprint exemplars from the Defendants.

IT IS THEREFORE ORDERED that Defendants' motion is **GRANTED**, and that the United States' motion is **DENIED**.

Dated this 21st day of July, 2006.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE

Attorney for Plaintiff:
William Pflugrath

Attorneys for Defendants:
John F. Robbenhaar
Phillip Sapien

Amendment is dispositive in this case, I have not addressed the Fifth and Sixth Amendment arguments.

-26-